Thank you, Your Honor, and I guess I'm the first one who gets to say good afternoon to all of Your Honors. Go rub it in. My name is Robert Bockel. I'm a lawyer with Casel Young & Logan. I represent James Tuminello and also UBS Financial Services. We were the ones who filed the lawsuit in district court, and we are the appellants here before you today. I'd like to reserve two minutes for my rebuttal, please. Count it down. I want to start with a couple of procedural items only because we do have a couple of motions that are pending before this court at this time. I wanted to make sure that all of you knew that today we're filing an additional motion. It's simply to ask the court to supplement the record. Now that Mr. Richards got permission to and has gone ahead and amended his statement of claim in the arbitration, we now have two claimants in the arbitration. We have Mr. Richards, and we also have Be Rich, the offshore entity. So that's actually happened, and so we filed a motion asking the court to supplement the record with respect to that. That particular issue is a significant development, as Your Honors are aware, from our briefing in this case. We hold that the modification to the statement of claim is a concession, that Be Rich is really, if not the real party in interest, it's at least a real party in interest. Richards and now Be Rich cannot ignore that Be Rich is a separate corporate entity from Mr. Richards the individual. They cannot ignore that Be Rich was the sole owner of the investment accounts in Switzerland where the alleged investment losses occurred. They cannot ignore that the law of Nevis, a tiny little federation in the Caribbean with St. Kitts, has law that says Be Rich is the only party with the right to assert the claim for losses on investments in those accounts in Switzerland. There are five different parties here. I just want to go over that to make sure we all know who's here and who's not. The one party who's not in front of the court, because we can't do that, is the distant cousin of my client, UBS Financial Services, and that's UBS Swiss Financial. That is the investment entity where these accounts were held in Switzerland. Again, Richards is the individual who was the manager of Be Rich. Then you've got Be Rich and then you have Mr. Tuminello, my client, who's a former registered representative of UBS Financial Services and also Financial Services itself. Mr. Richards became a very wealthy person in 2006. He could have but chose not to invest his $3.4 million with UBS Financial Services here in the United States. He could have done that in his own name. He had already opened accounts in his own name a year earlier, and instead he was worried about protecting his assets. And so Mr. Richards chose on his own, because he had apparently a litigious aunt and possibly because he had a divorce looming on the horizon, he chose to take advice from non-parties to the case here, including a lawyer in Florida, to go ahead and create Be Rich, this offshore entity. He decided that he wanted that entity to be something he owned and he wanted his wealth to be put in the hands of that entity. UBS Financial Services here in the United States is not allowed to handle accounts for foreign entities. You know, the question in front of us really isn't that. The question in front of us is the scope of the arbitration agreement and who gets to determine under the arbitration agreement what's arbitrable. And the real question is, do we get to decide what's arbitrable or does the arbitrator? Yeah, and I think that... Then the question, the subsidiary question is a choice of law. Do we follow a state law or do we follow a federal law? Sure. With respect to that, Your Honor, the arbitrability questions are most fundamentally, does there exist an agreement that has an arbitration clause in it between the relevant parties? And that gets us to the question about Rule 17 while we were in the district court and whether the court had the obligation there to determine who the real parties or party in interest were at the time of the motion practice. But if we were to decide that the question of arbitrability and the scope of arbitration is to be determined by the arbitrator, why don't we just send everything to the arbitrator and then you can make all your arguments? Right. You are not able to do that under the precedent with respect, Your Honor, because under the case law, Howsam tells you that you've got both substantive questions of arbitrability, which must be decided by a court, and procedural questions that go to the arbitrator. So, for example, in Howsam, there was a question of the eligibility rule under the NASD's rules. That was a procedural issue. But if the arbitration agreement provides that the arbitrator will determine the scope of that which is arbitrable, don't we then leave the scope of the arbitration to the arbitrator to decide? You do. Under the Steelworkers Trilogy and AT&T Technologies, if you have an agreement where the parties have clearly and unmistakably provided that the arbitrator will decide arbitrability, then yes, it goes to the arbitrator. We don't have that here. So let's look at the arbitration agreement. Sure. So let's take a look here. The only agreement that we know exists between the parties that has an arbitration clause is the account agreement between Richards the individual and UBS FS that he opened in 2005. That is an agreement that exists. It has an arbitration clause. It does call for arbitration of any disputes between those parties, which leads us back to the question about who is the real party in interest here to determine whether there's an agreement. With respect to an arbitration between Mr. Richards and your client, is the scope of arbitrability under that clause to be determined by the arbitrator? It is not, Your Honor. And the reason is that there's no agreement within that account agreement whereby the parties clearly and unmistakably agreed to have the arbitrators decide arbitrability. I know that the other side heavily leans upon the any disputes language that is there, but the decisions of the courts show that that language by itself is not enough. We cited, Your Honors, to decisions out of the Fourth, Eighth, and Tenth Circuits, but I think that there's something that's even more piercing into the point than that. And if you take a look at the AT&T Technologies case decision by the Supreme Court in the 1980s, you'll find that that case involved one of the broadest possible arbitration clauses I could think of because there the employer and the union agreed as between themselves that they would settle any controversies affecting their relationship in arbitration. And in light of that very broad arbitration clause, the Supreme Court decided in that case, that case stands for the proposition that it's the court who decides whether the underlying dispute, the merits dispute that they had in that case, goes to arbitration. Here's my problem with your argument. I'm just reading from the master account agreement. Okay. It says, and it's in various places, I'm on ER4, which is the fourth page of the district court's order, so that's where I'm getting it from. You agree, and by carrying an account for you, UBS Financial Services agrees, that any and all controversies which may arise between you and UBS Financial Services concerning any accounts, transaction, dispute, or the construction, performance, or breach of this or any other agreement is to be determined by arbitration. Well, it sounds to me as though if the arbitrator is supposed to determine the construction of the agreement, that sounds to me as though that's determining the scope of that which is to be arbitrated. I think it needs to be more than that, Your Honor. I think it needs to be a statement that the parties have agreed that when it comes to arbitrability, substantive arbitrability, we agree that question goes to the arbitrator. It doesn't say that. There's no case that requires that specifically. Well, I think that you, again, to cite you to the AT&T Technologies case, it doesn't say that exactly. What it does do, in that case, the Supreme Court very carefully went through the four precepts that came out of the Steelworkers Trilogy of cases in the early 1960s, other Supreme Court cases, and as it went through, I think it was the third of those precepts, the court was very careful to explain that we need to be cautious not to lightly defer rulings on what's arbitrable to the arbitrators. They were very careful about that. And there are many cases that we've cited to you that say courts should not interpret silence on the subject as an agreement that's clear and unmistakable, that the parties want the arbitrator to decide those issues. And so I agree with you, Your Honor. There's not a case that explicitly says that, but I think it's the natural progression from what the Supreme Court said in the AT&T. Without these hovering policies that you talk about, which are competing, which I acknowledge, as a matter of pure contract interpretation, any and all controversies would certainly satisfy, it seems to me, a reasonable standard that would include questions of arbitrability. And I think that you can't reconcile that. I understand the logic completely, but you cannot reconcile that with the exact same set of circumstances, probably even a more broad arbitration clause in the AT&T Technologies case, where the Supreme Court could have, if they wanted to announce an instrument whereby a broad arbitration clause by itself is an agreement to refer arbitrability to arbitrators, it could have announced that rule in that case. It did exactly the opposite. And it cited the precepts from its precedent in the Steelworkers Trilogy and said, we have to be cautious about not letting the arbitrators be the ones who decide. And they didn't do it in that case where they had a broader arbitration clause. That's really a policy question. What you're asking the court to do is to hold that something specific, vis-a-vis the issue of arbitrability, has to be addressed in the party's arbitration agreement. That's right, Your Honor. There needs to be language there. And the other point I want to make sure doesn't get lost is that... And how about Judge Fletcher's comment about the use of the word construction? I mean, any and all is not the only phrase. I mean, it goes on. Construction. It even says, or any other agreement. It doesn't even say any other agreement of the parties. It just says any other agreement. You have the sense that this is about as inclusive or intended to be as about as inclusive, one could imagine, the limits of human language would permit. It does have broad language in that respect, Your Honor. But one of the other things you learn from the Supreme Court cases is that you have to be looking at agreements between the parties. And I know I'm going back to the Rule 17 real party and interest issue again, but you do have two parties there. The reason we're bringing this motion to supplement the record is to emphasize the point that we're not only talking about Richards. He was the one and only person on the other side of that agreement with UBSFS. There is no agreement between Beerich and... But I think we can short-circuit that. That is to say, if we were to agree with the district court, and if we were to conclude that the question of arbitrability is to be determined by the arbitrator, obviously the arbitrator could agree with you and say, listen, this is a fight between Richards and the other party to the contract. End of story. Rich is gone. You could do that, Your Honor. But I think that what you should be doing is paying attention to what the Supreme Court spoke about in the Moses H. Cohn case. In Moses H. Cohn, there was a hospital which had a construction contract with a construction company, and there was also an architect involved who played the role of sort of a referee in their dealings. And disputes arose. The construction contract had an arbitration clause in it, and so the hospital, for any disputes it had with the construction company, had to go to arbitration. There was no agreement with any arbitration clause in it with the architect. And so the Supreme Court said it's the job of the court to look at the different parties that are in front of you and to decide which of them have agreements between them, and those that do have an agreement to arbitrate their disputes, that goes to arbitration, and those that don't do not go to arbitration. And even though that may result in piecemeal litigation, in other words, parsing out who the parties are and what their relationships are, that's what the court is supposed to do. Well, of course that's right. But the question is, as you're drawing the line, who draws the line as to what's arbitrable? If the arbitrator gets to draw the line as to what's arbitrable, then anything that's not within the line drawn by the arbitrator is not arbitrable. That's subject to lawsuit. If the arbitrator doesn't get to decide where the line is and the court does, well, the court draws the line first, and then I guess what's left over is for the arbitrator. So what we're arguing about has nothing to do with that, well, some goes to the arbitration and some doesn't. What we're arguing about is who gets to decide what's arbitrable. Well, and I think it is bound up in that only because you have to have, first thing first, under Housen, you have to have an agreement between the relevant parties before you can— Well, we do have an agreement. There's an agreement, but it's not with B. Rich. I understand. And there is a subsequent contract whereby B. Rich signed off on an exclusive Swiss law and jurisdiction clause. And B. Rich is not a party here to this suit? To this lawsuit? It is, Your Honor, because we sued both. We sued both. Okay. So those four are there. The only of the five, the only party who's not party to the litigation is the Swiss entity. I got you. Okay, let's go from the other side, and then we'll give you a chance to respond. Okay. Thank you, Your Honor. Good afternoon, Your Honors. My name is Alan Anderson. I represent Mr. Richards as well as his successor interest in the defunct corporation, B. Rich. Is that better, Your Honors? That's better, thank you. Your Honor, I have three main points to submit from Main Street in this Wall Street case, and that is that contracts can delegate arbitrability to the arbitrators. And it is not merely a matter of the scope of the arbitration clause in the Bibbitt case if that's accompanied by a referral to the rules of a specific arbitration tribunal that is additional evidence that the parties clearly and unmistakably intended for the arbitrators to resolve all issues. And that has been addressed before the Court here before. Second is that the burden of proof below in here was on UBS, and that burden included not only to show that Mr. Richards had no claims whatsoever, but also to show that the arbitration clause is not susceptible to an interpretation that covers this dispute. My third point, Your Honor, is that no court has accepted that a party seeking arbitration has to first resort to federal court and demonstrate that it's a real party in interest. There is no precedent for the argument that's made in this case. Your Honor, addressing the first point and most important point, this conclusive in this matter, is that here the expectations of the parties was that all issues would be determined by the arbitrators. We're not dealing with two parties that have visited arbitration contracts for the first time. We're dealing with an industry that arbitrates all the time. It's not just a custom of the industry. It verges on a secular religion. The FINRA members are required to arbitrate all disputes with their customers as well as all disputes among themselves. It's actually the brokers that choose to impose an additional requirement on their customers to arbitrate with them, and that's where this contract comes from. And since BIVC, for over 15 years, it's been, they've been on notice that these contracts would be interpreted to delegate all power to the arbitrators. We have to use the clumsy word arbitrability. That can mean more than one thing, but here what we're looking at is who makes the initial determination. What are the expectations of the parties? The expectation of the industry is that all issues will be decided by their own FINRA arbitrators, and that's decided under the Second Circuit Law, BIVC, as well as the Satcharow case, which is New York law. Well, this is the hometown of the industry. Arbitration is as common as skyscrapers, and that's the expectation of the industry and the custom of the industry that all issues will be resolved in arbitration and that the arbitrators will have the broadest possible say. The whole idea is to keep the parties out of court, which the provisions of this contract go on further to say that neither party shall resort to court. And the Ninth Circuit accepts the general rule of incorporation of the rules of the arbitration tribunal. In the Walmart stores case, there are additional cases where the district courts have accepted that if the parties invoke AAA rules, that they are agreeing to delegate broad powers to the arbitrator. Well, FINRA arbitration is not less comprehensive than these systems of arbitration. Indeed, it's more so because it deals not only with situations of arbitration, but it's a comprehensive regulation system of rules for the whole industry. It governs everything about the industry, including the real issue in this case, who's a customer? So the arbitrators have special competence, as was recognized in the Howsam case, to decide their own rules, decide the application and construction of those own rules. And that's the clear intention of the parties to this contract, to the extent that Mr. Rich had any input into the contract, but they're actually drafted by the brokerage firms. So it's unconscionable that they would take the benefit of these arbitration contracts and routinely deprive people of their right to trial and jury trial, but then turn around and say, we have the right to take you to court on the issue of our choice whenever we wish. No, the entire situation is confided to the arbitrators. If that were not so, then we would need to look at the scope of the arbitration clause, and then this court would need to make the determination of whether the issues in this case are arbitrable. And the court has already noted that this is a very broad arbitration clause, so I won't put the court through that painful catechism twice, but I will look at briefly Mr. Richard's claims to see if they're within the scope of that clause. And again, our assertion is that they are Mr. Richard's claims. There is no concession that they belong to Rich. Those claims involve financial advice that was given to Mr. Richard's. He went to Mr. Tominello and said, I've got money coming, I want it to be safe. Mr. Tominello said, I can put you in touch with a lawyer who can recommend an asset protection plan. And these, I believe, are the undisputed facts in the record. Mr. Richard's did so, formed a holding corporation. That corporation invested in, at Mr. Tominello's recommendation, the Swiss affiliate of UBS. Your Honor has pointed out the breadth of this contract, that it would cover others. And in fact, the contract's broad enough that it works up the chain to include the parent company and also all affiliates. So it's not a stretch at all to say that it encompasses UBS Swiss, the Swiss affiliate, as well as UBS Financial Services, the plaintiff in this case. Not only did he get information about how to invest his money, he went through Mr. Tominello to receive disbursements from UBS Swiss. Mr. Tominello was involved in every conference call that Mr. Richard's had with UBS Swiss. And at no point did Mr. Tominello say, they're trading on margin. This is risky for you. You should withdraw more of your money. So that simple financial advice would have saved Mr. Richard's the damages that he suffered in this case, and they aren't his damages. How is this germane to the issue that we're discussing? We understand that kind of controversy falls comfortably within the contemplation of the parties. But how does it inform us on the ultimate question as to who decides? Your Honor, I'll address that question first. This is a subsidiary question. In the event that the court holds that this matter is not delegated to the arbitrators, then this court has to reach the issue of arbitration. But the breadth of the clause is relevant in assessing the intention of the parties. What Bibbick says is it's the combination. If you have a very broad clause and you have a reference to the rules of a particular arbitration tribunal, then you have a clear and unmistakable agreement that everything should be decided by the arbitrators. Your Honor, as to the law of Nevis, it was argued below that there was a further third-party interest rule that prohibited anyone from bringing cases on behalf of Nevis corporations. We pointed out that this referred to suits, and an arbitration has been widely held not necessarily to be a suit. If we were to agree with you that the scope of what is arbitrable is to be determined by the arbitrator, do we need to consider this Nevis statute? No, Your Honor, we would not reach any of these issues. No. But I am trying to respond to the arguments that were made in this case that both the Nevis law and the forum selection clause prohibit Mr. Richards from any relief in this matter. To me, that's a question for the arbitrators, but I have to address it in the event that the court says that it's a question before this court and agrees with UBS that Mr. Richards has no claims that are subject to arbitration. I want to make one point about the Nevis case, the Schiff case, that the trial court did not have the benefit of. It has been asserted in the brief that it represents the law of Nevis. As to the holding in the case that an individual is not an appropriate party to bring claims on behalf of a corporation, that is Mississippi law, not the law of Nevis. The actual law of Nevis that is cited in the case is identical to what we stated in our briefs, and it says that when you have a dissolved corporation, the manager is the party to bring claims on behalf of that corporation. So our argument is that even if Mr. Richards didn't have claims in his own right, he would have all of the same claims on behalf of BRICS, the dissolved corporation, and that's what the law of Nevis says. But more importantly, there is no proof that was before the court of foreign law that would be negative to that proposition, that Mr. Richards has all the rights that the corporation formerly had. So whatever claims that corporation could have belonged to Mr. Richards. That may be an issue for the arbitrators as well, but it is not a bar for him to pursue arbitration. The last question is whether the forum clause similarly could deprive Mr. Richards of his ability to arbitrate. The latest word on that is a UBS case, UBS v. West Virginia, where the court held that that is a classic procedural question for arbitrators to resolve. So this is not even under the court's job under Housum. The court determines whether a contract is formed in absence of an agreement for the parties to submit that to the arbitrators. But procedural issues are not subject to the courts. They go right to the arbitrations, and that's what the court held in that UBS case, that this was a classic question for the arbitrators, the extent that we look at a forum clause. And whether it's inconsistent with the arbitration clause in this case, as the trial court pointed out, it's not signed by UBS. It's signed by the Swiss affiliate. The Negrompa case says that when you have a forum clause that's not mutual, that allows the party to the bargain with greater power to select a forum of its choice but impose a different forum on the party with weaker power, that lacks mutuality and is unenforceable. And the trial court was within its discretion not to enforce that clause in this case. The Swiss jurisdiction clause does not reference the earlier arbitration agreement, and it does not, most importantly, have a merger clause that suggests that all previous agreements are off the table, Your Honor. Lastly, the clause violates FINRA rules in itself, and this would be an issue for arbitration to determine. The approach of the Ninth Circuit under Cate Flannery is to harmonize forum selection clauses with arbitration agreements. And the strong federal policy in favor of arbitration, which is the same strong federal policy under New York law, under the Second Circuit, is that the party's choice of forum arbitration should be upheld unless the agreement clearly says otherwise. And that's one of the cases that was cited by the opposition by Remus, which says that if the second clause states that the parties must adjudicate, that's inconsistent with arbitration. We don't have any such clause here. The Swiss forum clause is simply a venue provision or a venue provision specifying where the results of the arbitration can be enforced. Your Honor, but the big issue in the case, as the Court pointed out, is arbitrability and what the expectations of the parties are. It's clear that the parties can make a contract that the arbitrators will decide all issues. We believe that that's what the parties did in the instant case in the light of Bivec, in the light of Satcharo, in the light of the Ninth Circuit cases recognizing that even a broad clause in the labor law context can submit all issues to arbitration. It's appropriate to look at that. What we have here is an industry that's based on custom. This is not a novelty. The industry arbitrates every day, much as the labor industry does. So it's appropriate to say we need a uniform decision on this, and if you're going to use FINRA arbitration and a broad arbitration clause, not just we're going to arbitrate whether certain items in the contract are arbitrable. No, it's a broad arbitration clause, and it's referred to FINRA, which has broad discretion to construe its own rules, to interpret, to construct, as the Court pointed out, the inescapable conclusion that the parties have delegated all issues to the arbitrators in this case. Thank you, Your Honor. Thank you. Would you like a minute? I think I reserved two. We'll be very generous and give you two. You're very nice, Your Honor. Thank you. We're all that's standing between you and lunch, though. Well, you're all that's standing between us and lunch. That's right. I'll do the best I can so we can all eat. We'll make sure you get a chance to say what you need to say. Thank you very much, Your Honor. Earlier, a question was raised with respect to choice of law, and I just want to make very clear that the one agreement that does exist that has an arbitration clause, that's the Richards Agreement with UBSFS, it does call for application of New York law, but there's also a federal law, choice of law clause, specific to the arbitration clause. So New York law would apply to interpreting the agreement, but the Federal Arbitration Act and all of the case law interpreting it is what applies with respect to arbitrability rules. What's important about that is that under New York law, it's a rule of New York law, that if you have a subsequent agreement, that that trumps your earlier agreement, and that's the applied energetics case that we cited. And here you've got the subsequent agreement. So if you're going to conclude that the Richards Agreement with UBSFS is broad enough to include BRIC, BRIC certainly has a subsequent agreement, and that subsequent agreement calls for exclusive Swiss law and jurisdiction, and so that would trump under that law. And in this circuit, you have two different cases where this court has recognized that even though my clients are not parties to the agreement that calls for exclusive Swiss law and jurisdiction, that where the disputes center upon the matters that relate to that contract, you can apply that foreign selection clause to non-parties. That was done in the Manetti-Ferro case, and it was also done by the Ninth Circuit in the Holland America versus Wartsilla case that we cited. There are no words in the one agreement that we have that does have an arbitration clause that specifically says arbitrability goes to the arbitrators. The contract is silent as to that issue, and this is very much unlike, there was an allusion to the AAA cases. This is not a AAA case where the parties agreed to incorporate the AAA rules, which have a rule that says we get to interpret and decide upon our own jurisdiction. There's no such rule in FINRA. So this agreement does incorporate FINRA rules, but there's no such rule in FINRA. And the Bybic case, maybe I say it differently than counsel does, but either Bybic or Bybic case, does not hold, as Beerich argues that it does.  Bybic was merely a procedural issue that went to the arbitrators. It was not a substantive arbitrability issue, and Bybic does not stand for the proposition that the anti-disputes clause means that the parties clearly agreed. Okay. You've now had three minutes if you want to give us one last thought. Just on Nevis Law real quickly, Your Honor. Thank you. And that is that if you read Section 54 of that ordinance that we provided to the court, even a LLC in Nevis that's been discontinued persists for another three years to pursue claims in its own name. Okay. Thank you. Thank both sides for your arguments. Thank you. Thank you for your patience in waiting for us. Terminello v. Richards, submitted for decision.
judges: Dearie, Fletcher, Fisher